FACTS

ACTUAL INNOCENCE CLAIM

The Plaintiff, In the case at bar is however is not limiting his claim, rather he is claiming Actual Innocence, supported by false Arrest, False Imprisonment, and Malicious Prosecution, all in violation of Due Process, which all taken together,brought about an innocent person being placed in harms way.

In the case at bar, the Plaintiff has steadfastly maintained his innocences. After learning that he was being sought for questioning, plaintiff turned himself in to the police department, in order to insure them of his innocence.

Plaintiff was placed in this case, because of an old case history which was similar to the case in which he now found himself being questioned about. This was brought about based on a distription by Police Officer Hughes, who stated that he heard a description put over the radio/airways by the 90 anti-crime team about a pursuit of a male on a bike, wearing a "black jacket and a red sweater" and they (anti-crime unit),lost sight of the suspect on lorimer and throop ave. P.O. Hughes, subsequently saw a black man riding a bike North bound on Throop ave.and despite the facts that this blackman other than the fact that he was a black man on a bike,did not fit the description putover the airways by anti-crime units, and in direct violation of <u>People v. Brogdon</u>, 8 A.D.3d 292, <u>People v. Holman</u>, 21 N.Y. 2d 105" and <u>People v. Howard</u>, 50 N.Y.2d 583. which states " However flight alone or in Conjunction with equivocal circumstances that might permit a request for information is insufficient to justify pursuit.

P.O. Hughes desided to chase this black-man on a bike and give a description,male black 40-45 years old, with pocked skin, wearing a black sweater with rust colored hooded sweater underneath, (see; exhibit **A**) and stated he got a good look at the male black.

P.O. Hughes stated that he observed the male black throw a black and silver firearm over the fence of 398 Wallabout street. where SGT. Tavers, The first officer on the scene stated " He heard a female scream and observed a female chasing a male riding a bicycle south bound on Manhatten ave. and he, with P.O. Arias driving, started to

chase the male up lorimer street and lost sight of the male on Throop ave. ( see; exhibit **B**) P.O.Arias, stated that he did not get a good look at the males face because it was covered up.SGT. Tavera's gave a description over the radio " male black,red sweat-shirt, on a BMX bike(see; Transcripts pg.73 line 1)(see; DD592).

A description completely different from that later given by P.O. Hughes. after P.O.Hughes lost sight of the was chasing, he and the victim went to the 90th precinct to view photo's on the computer manager system. they both were unable to identify anyone.at which time the lead detective assigned to this case,(Detective Bonilla), later testified that she recieved a phone call from Sergeant Mc-Carthy, of the 79th precinct, who stated that they had a case similar to the one that we were investigating, a couple of years ago,with an individual fitting the same description, and the same type of robberies.

He then gave me a NYSID number and told me that i should look into this individual, as it's possible that this could be my suspect(see; exhibit **C**). The NYSID number that was given to detective bonilla, was that of Plaintiff, Anthony Daniels,which is far from the description given from victim and P.O.Hughes,furthermore. Mr Daniels has never been arrested for robbery in the 90th precinct, nor had any contact with SGT,McCarthy.

After entering the NYSID number into the same computer which P.O. Hughes and Taylor Westfall had viewed earlier, she ( detective Bonilla) placed the Plaintiff's photo into a photo array, where the Plaintiff's photo clearly stands out, because it was much lighter than the other photo's(see;exhibit **D**) , and showed the photo array to P.O.Hughes , where despite the fact that Plaintiff Anthony Daniels did not have a pocked skin as described by P.O.Hughes in his description of the male that he chased, picked out Plaintiff's photo which I.D. Detective Bonilla then used to print up a wanted poster.

Subsequently, Detective Bonilla, arranged for a line-up to be viewed by Taylor Westfall and Ashely Reardon,dispite the fact that both of these witnesses had never claimed to have seen the attackers face because he wore a mask the entire time, as well as being viewed by P.O. Hughes who had described a male black with pocked skin.

(2)

Yet at this line-up, all three people picked out the Plaintiff as was claimed by detective Bonilla.

Dispite the fact that the plaintiff does not have pocked skin, or otherwise fit any of the known descriptions given at anytime.(see; exhibit C). Victim Taylor Westfall testified at the Grand Jury,that she had been unable to see the attackers face because he was wearing a mask,(see; exhibit ₿), and she picked plaintiff out of the line-up based on his height, his build,the eyes,skin color and the force that he hit her with,(see; exhibit ₿), And dispite the fact that Ashely Reardon, had given a description of her attacker as 6 frot-tall, light skinned black or dark-skinned hispanic.(see; exhibit ₡).

The Plaintiff, in the case at bar,is a dark-skinned blackman,5'9" with a full salt and pepper gotee,(see; exhibit ₡).

The prosecution, detective bonilla or P.O.Hughes, had any evidence against the plaintiff. The prosecutions entire case rests on the false identification of the Plaintiff, the officers manipulation of the facts, and the subornation of perjury. It is clear that based on the fore-going facts that the Plaintiff can show clear and convincing proof that he is Actually Innocent. The Court has stated that clear and convincing evidence is;

> " Evidence which produced in the mind of the
> Trier of fact a firm belief or conviction
> as to the Truth of the allegations sought
> to be established, evidence so clear,direct
> and weighty and convincing without hesitancy
> of the truth of the precise facts in issue.
> [People v.Steward, 61 A.D.3d 1059]."

When the issue is weather an Individual is actually Innocent, the Hearing Court, should be permitted to weight all trustworthy information in reaching it's decision. the fact finder mandate is no longer,as in Trial, to assess legal sufficiency of the evidence of guilt. The Supreme Court, in Schlup, stated in regard to weather a Habeas Petitioner had sufficienctly show innocence to excuse procedual default :

> " The Habeas Court must make it's determination
> concerning the Petitioners innocence in light
> of all the evidence,including that alleged to
> have been illegally admitted wrongly,wrongly
> excluded or to have become available only after
> trial. [SCHLUP v. U.S. 513 at 328].

In the case at bar, the officers and prosecution manipulation of evidence and subornation of perjury was material to the guilt or

come at by means sufficiently distinguishable to be purged of the
primary taint, and therefore the trial Court properly denied the
people's application for an independant source hearing and properly
suppressed complainants in-Court identification.(see; People v.Underwood,
239 A.D.2d 366).

   Ms. Reardon, the second victim made a 911 call, that I don't have
a copy of, which is on the record. Ms.Reardon was asked by the operator
" can you give me a description?", Ms.Reardon said"no because his face
was rapped up" Ms.Reardon did give a description once she went to the
police station. Ms.Reardon,stated that her attacker was 6' tall, light
skinned black or dark skinned Hispanic. Ms.Reardon, gave a description
of two different people, The attacker could have either light_skin or
dark skin,not both, and dispite the Plaintiffs not being 6' tall.(see;
exhibit E,DD5 #33).

                  " THE WITNESSES IDENTIFICATION WAS UNRELIABLE
                    SINCE WITNESS STATED THAT THE DEFENDANT WAS
                    "WHITE AND 5'2" and HE WAS LIGHT BROWN AND
                    5'5".(see; PEOPLE v.DeJESUS,RIOS,990 F.2d 72)

   The witnesses identification was unreliable since witness said
defendant was 5'6" to 5'8" with heavy build and afro; and he was 6'
thin, with straight shoulder lenght hair,(see; Tomlin v.Myers,30 f.3d 1235)

   In the case at bar,detective Bonilla, knew that she was committing
perjury, where at the Wade hearing detective Bonilla told the Court that
it was a fact that Ms.Westfall had seen Mr.Daniels face . while they
were fighting in the vestibule of her building(see; pg.35 lines 12-23).
   The Judge then asked detective Bonilla if the victim had told her
this? Detective Bonilla stated "No, no she did not"(see; pg.184 lines
7-11) after recanting that testimony at the wade hearing, detective
Bonilla went on to tell the Jury at trial that the victim Ms.Westfall,
told her that she had seen Mr.Daniels face (see; exhibit C).
   Detective Bonilla who claimed to bee the lead investigator on this
case, testified that she was unaware that a mask was involved in the
Plaintiff's case, yet every witness stated that they could not see the
attackers face because it was covered.(see;exhibit B, DD5#5)(exhibit E,
DD5# 33)(exhibit D,pg.17), This testimony is not only unworthy of
belief but is perjury, and known to be perjury by Detective Bonilla.

                                (4)

Detective Bonilla, further committed perjury when she testified that " no one was standing up when P.O.Hughes viewed the line-up, when hearing is based on legitimacy(see; pg. 123 lines 18-19) yet P.O.Hughes testified that when he viewed the line-up everyone was standing up.(see; exhibit **C**), and as detective Bonilla conducted the line-up,there is no way she could not have known this,besides she is required to take notes on the line-up(see;exhibit **C**).

In the instant case,the officers conduct in a position which they knew to be false was an abrogation of their responsibility as officers.

" THE INTEGRITY OF THE COURT IS SO VITAL TO THE HEALTH
OF OUR LEGAL SYSTEM THAT NO VIOLATION OF THAT INTEGRITY
NO MATTER WHAT IT'S MOTIVATION,CAN BE CONDONED OR IGNORED
JUSTICE BRANDEIS, AS QUOTED IN OLMSTEAD.

WHEREFORE: Plaintiff respectfully prays that this Court make an order Granting the relief sought herein and granting such other and further relief as this Court may seem just and proper...

## POINT TWO
### PLAINTIFF WAS DENIED DUE PROCESS

In accordance with Historical Law, the interest of officer's is not that he or she gets a collar, but that justice shall be done.

In the case at bar, the question begs to be asked,"may an officer in the course of an investigation, either give a false statement / testimony or permit a witness to give a false statement/testimony, when such testimony is intrinsically related to the crime under investigation ? or is he or she guilty of Perjury ?

Officer's of the Law owe a duty of fair dealings to the accused and candor to the Law, a duty violated when he obtains an arrest based on false evidence, he or she knows to be false, and such misconduct impairs Due Process rights and require reversal.U.S.C.A. Const.Amend. 14.

In the case at bar, two victims, P.O.Hughes and Detective Bonilla commited Perjury, where each told a story on the D.D.5, and told a second story at the Grand Jury, and yet another story at the Wade Hearing, and told yet another story at trial.(see;exhibits).

> " Principal that a state may not knowingly use
> false evidence, including false testimony,to
> obtain a tainted conviction, Implicity in any
> concept of ordered liberty,does not cease to
> apply merely because the false testimony goes
> only to the credibility of the witness;USCA.
> Const. Amend. 14th."

In the case at bar, detective Bonilla, said that she recieved a phone call from a Sergeant McCarthy of the 79 precinct,who stated that he was looking into our cases and that they(79th pct),had a case similar to the one that we were investigating, a couple of years ago, with an individual fitting the same description, and the same type of robberies, He then gave me the suspects MYSID number aqnd told me that I should look into this individual,(see;exhibit C).

This testimony by detective Bonilla, in and of it's self is un- worthy of belief, as a that time, the only description that detective Bonilla had was the one provided by P.O.Hughes,which described the person he chased, as having pocked skin, 40-45, wearing a black sweater with a rust colored hooded sweater underneath,(see;exhibit A).

This is the only identification given by anyone who purported
to have seen the males face, yet Detective Bonilla, would have this
Court believe that based on this vague description, a sergeant from
another precinct connected that description with the NYSID number of
the Plaintiff Anthony Daniels, whose picture, detective Bonilla then
placed into a photo - array, which was shown to P.O.Hughes, who
purportedly then picked out Plaintiff, dispite the fact that Plaintiff
did not have pocked skin, so could not have been the male that P.O.
Hughes chased, according to P.O.Hughes own testimony. nor did P.O.
Hughes or the initial officers at the crime scene give a height or
weight for the male black that was being chased (see;exhibit **A**).

P.O.Hughes, states in his first report that he did get a good look
at the perp.(see;exhibit **A**), and went on to stress the fact that said
perp had pocked skin.

No one in the photo array shown to P.O.Hughes had pocked skin,
further more, how was detective bonilla able to come up with a Photo
Array for P.O.Hughes to view when P.O.Hughes gave a vague description,
weight,height or skin complexion.

> " Number one factor is the opportunity to view
> criminal at the time of the crime" see; Neil v.
> Biggers, 409 U.S. 188).

There was no evidence connecting Mr. Daniels at the crime scene,
because no witness could identify a masked face. nor did the description
provided by P.O.Hughes match the one provided by the first officer on
the scene, Sergeant Taveras provided the very first description of the
suspect, male black, red sweat shirt, on a BMX bike,(see;exhibit **B** pg73
lines 1-3).

P.O.Hughes stated that he heard, black jacket, red colored hoody
sweater, over the radio (see;exhibit **A** DD5 #2), P.O.Hughes went on to
further perjure himself, when at trial he changed his testimony yet
again by testifying that he heard, male black, brown hoody, riding a
purple bike,(see; exhibit **A** pg.115 lines 4-7).

Sergeant Taveras, description did not provide any information
regarding the suspects height or weight, and riding a bike is not
sufficently indictive of criminal activity,(see; People v.Waters, 259
A.D.2d 642), in accordance with People v. Beckett, 88 A.D.3d 899.)

P.O.Hughes, when testifying at the Grand Jury, was asked by a Juror," Why did you chase Mr.Daniels ?" P.O.Hughes responded, " Because he matched the description of the person that was being described by the other units". P.O.Hughes mislead the Grand Jury, knowing that his teastmony was false (see;exhibit A pg.27 lines 17-19).

sergeant Taveras stated, male black, red sweatshirt, on a BMX bike. P.O.Hughes further perjured himself by testifying at trial he heard " male black, brown hoody, riding a purple bike(see;exhibit A pg.115 line"s 4-7).

P.O.Hughes stated in his initial DD5 report that " he observed the male black that he was chasing throw a black and silver firearm over the fence (see; exhibit A), and at trial changed his testimony to state " he saw the male reach into his waist and throw an object over the fence".

This change of testimony was very convenient,as it helped to explain away the fact that both the victims, Taylor Westfall and an experienced police officer P.O.Hughes, stated that the attacker possessed a fire-arm. yet when the rear lot of 308 Wallabout street was searched, no firearm was found, instead the police officer picked up a silver pipe, which victim Taylor Westfall indirect contradiction to her DD5, statement of a firearm(see;exhibit D) now identified the pipe as the weapon.(see;exhibit D,Pg 7, Line, 17-18)

Ms.Westfall stated that she never saw the attackers face because he wore a mask, and testified at the Grand Jury that she picked the plaintiff out of the line up based on "his height, his build, and the force that he hit her with,his skin color and eyes,(see;exhibit D).

Yet at the line-up ,plaintiff was placed in the line-up bear faced, and Ms.Westfall testified that her in-Court identification was based on how plaintiff looked at the line-up.(see;exhibit D,pg. 62 line 6-9).

> " THE DEFENDANT MAY BE COMPELLED TO CONFORM
> HIS APPEARANCE AT A LINEUP TO HIS APPEARANCE
> AT THE TIME OF THE CRIME,THIS LINEUP WAS NOT
> UNDULY SUGGESTIVE BECAUSE THE PARTICIPANT
> WERE MASKED,(People v.Cwikla, 46 N.Y.2d 434).

Following a robbery on halloween,when defendants faces were covered or disguised and the complainant only identified them from their coats, the People could not establish that the incourt identification was

punishment of the plaintiff, and such bad faith of the officers in not being candid with the Law, cannot be said to be harmless, when it is prejudicial and injurious to the plaintiff who is Actually Innocent.

## EXHIBITS/EVIDENCE

1. DETECTIVE BONILLA FALSELY STATED THAT SHE HAD NO KNOWLEDGE OF A
   MASK BEING INVOLVED IN MR.DANIELS CASE.

2. DETECTIVE BONILLA DID NOT CONFORM THE APPEARANCE's OF THE SUSPECTS
   IN THE LINE UP TO THE APPEARANCE OF THE TIME OF THE CRIME.

3. P.O. ARIAS TOLD DETECTIVE BONILLA THAT THE ATTACKERS FACE WAS
   COVERED.(see;DD5#5)(see;pg.191).

4. DETECTIVE BONILLA SPOKE WITH MS.REARDON AND WAS ALSO TOLD THAT THE
   ATTACKER WAS MASKED.(see; DD5 #33).

5. (see;PG.17-18)(see;pg.10),THESE TWO STATEMENTS ARE PROOF THAT
   DETECTIVE BONILLA IN FACT HAD KNOWLEDGE OF A MASK,DETECTIVE INTENT-
   IONALLY LEFT OUT THE MOST CRITICAL AND CRUSIAL PART OF THEIR
   STATEMENTS,WHICH PERTAINED TO THE MASK,AND THE ATTACKERS FACE BEING
   COVERED.

6. Ms.TAYLOR WESTFALL, TESTIFIED AT THE GRAND JURY THAT THE ATTACKER
   WORE A MASK.(see;pg.17)

7. DETECTIVE BONILLA STATED AT MR.DANIELS WADE HEARING THAT IT'S A FACT
   THAT MS.WESTFALL SAW MR.DANIELS FACE. DETECTIVE WAS THEN ASKED BY
   THE JUDGE," DID THE VICTIM TELL YOU THIS?" DETECTIVE BONILLA SAID "NO,
   NO SHE DIDN'T"(see;pg.35)

8. DETECTIVE BONILLA WENT ON TO PERJURE HERSELF AT TRIAL,BY STATING THAT
   MS.WESTFALL TOLD HER THAT SHE SAW MR.DANIELS FACE,AFTER TELLING THE
   WADE HEARING JUDGE THAT THIS WAS NOT THE CASE.(see;pg.184, 7-11).

9. DETECTIVE BONILLA FALSELY STATED ONLY THREE PEOPLE VIEWED THE LINEUP,
   MS.WESTFALL,P.O.HUGHES AND MS.REARDON (see; pg.17 lines5-7).

10. DETECTIVE BONILLA STATED AT TRIAL THAT SOMEONE ELSE VIEWED THE LINEUP
    BESIDES THE TWO VICTIMS AND P.O.HUGHES(see;pg.195 lines 1-8)
    FURTHERMORE,DETECTIVE BONILLA STATED THAT SHE DID NOT RECALL THE
    PERSONS NAME.

11. DETECTIVE BONILLA STATED THAT ALL THE FILLERS IN THE LINEUP WERE
    DIFFERENT IN HEIGHT, THEY RANGED FROM 5'7" to 5'11"(see;pg.183 lines)

12. DETECTIVE FALSELY STATED THAT MR,DANIELS NEVER SPOKE OR MOVED OUT OF
    HIS SEAT FOR ANY REASON AT ALL.(see;pg.180 lines 7-12).

13. DETECTIVE BONILLA ALSO STATED THAT THE PARTICIPANTS IN THE LINEUP
    REMAINED IN THE SAME POSITION AS DISPICTED IN THE PHOTOGRAPH(pg180)

14. DETECTIVE BONILLA ONE PHOTO DUPLICATED ONE PHOTO OF THE LINEUP FOR
    ALL THREE LINEUPS THAT WERE CONDUCTED AND ENTERED INTO EVIDENCE,
    (SEE PJ. 177-178).

15. DETECTIVE BONILLA FALSELY STATED SHE DID NOT ALTER THE PHOTO ARRAY
    (see; pg.14 lines 9-10)

16. DETECTIVE FALSELY STATED THAT SHE ONLY SHOWED P.O.HUGHES THE PHOTO
    ARRAY (see;45 lines 12).

17. DETECTIVE BONILLA STATED P.O.HUGHES PICKED MR.DANIELS OUT OF THE
    PHOTO ARRAY (see;pg. 15 lines 1-5).

18. BIANCA LAO, NOT ONLY DID SHE VIEW THE PHOTO ARRAY TOGETHER WITH P.O.
    HUGHES,BUT SHE WAS ALSO THE ONE WHO MADE THE IDENTIFICATION.(see;DD5&6).

19. P.O.HUGHES MISLEAD THE GRAND JURY WHEN HE WAS ASKED " WHY DID YOU
    CHASE MR.DANIELS", P.O.HUGHES STATED " HE MATCHED THE DESCRIPTION
    OF THE PERSON BEING DESCRIBED BY OTHER UNITS(see;exhibit A,pg.27 lines
    17-19).

20. P.O.HUGHES STATED THAT HE HEARD THE ANTI-CRIME TEAM PUT OVER THE
    RADIO, MALE BLACK ON A BIKE WEARING BLACK JACKET AND A RED HOODED
    SWEATER (see; DD 5#2).

21. P.O.HUGHES STATED WHEN HE TESTIFIED AT TRIAL ONE THING THEN CHANGED
    HIS STATEMENT TO,HE HEARD,"MALE BLACK WEARING BROWN HOODY,RIDING A
    PURPLE BIKE.(see;exhibit A,pg. 115 lines 3-7).

22. P.O.HUGHES STATED IN HIS INITIAL STATEMENT THAT HE OBSERVED A MALE
    BLACK THROW A FIREARM OVER THE FENCE.(see;DD 5#2).AND THEN CHANGED
    HIS STATEMENT TO HE SAW " the black male reach into HIS WAIST AND
    THROW AN OBJECT OVER THE FENCE. (see;exhibit A,pg. 100 lines 3-4).

23. DETECTIVE BONILLA ALSO STATED THAT SHE HEARD BROWN OR RED HOODED
    SWEATER (see; pg.156).

24. P.O.HUGHES STATED THAT " THE PERP IS A MALE BLACK 40-45 YEARS OLD
    POCKED SKIN, WEARING A BLACK SWEATER WITH A RUST COLORED HOODY UNDER
    NEATH (see; DD 5 # 2).

25. DETECTIVE BONILLA STATED THAT MR.DANIELS DID NOT HAVE POCKED SKIN AT
    THE TIME OF HIS ARREST.(see; pg. 189).

(2)

<u>VERIFICATION</u>

STATE OF NEW YORK   )
                    )ss:
COUNTY OF WESTCHESTER)


        ANTHONY DANIELS, BEING FIRST DULY SWORN, DEPOSES AND SAYS:

I AM THE PLAINTIFF ABOVE NAMED; I HAVE READ THE FOREGOING CLAIM
AGAINST THE CITY OF NEW YORK AND KNOW ITS CONTENTS; THE SAME IS TRUE
TO MY KNOWLEDGE, EXCEPT AS TO THE MATTERS THEREIN STATED TO BE ALLEGED
ON INFORMATION AND BELIEF, AND TO THOSE MATTERS I BELIEVE THEM TO BE
TRUE.


                                        ANTHONY DANIELS
                                        PLAINTIFF/PRO-SE
                                        SING SING CORR.FACILITY
                                        354 HUNTER STREET
                                        OSSINING,NEW YORK
                                                10562



SWORN TO BEFORE ME THIS

  9  DAY OF December ,2014

  Patricia Lee
  NOTARY PUBLIC


        8/22/15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ANTHONY DANIELS,
                    Plaintiff,

        -against-

P.O.MARISOL BONILLA, N.Y.P.D.
P.O.SEAN HUGHES, N.Y.P.D.
                    Defendants,

---

                                        AMENDED COMPLAINT

                                        JURY TRIAL REQUESTED

                                        14-civ-3017(KAM/LB)

        This is a Civil Action authorized by 42 U.S.C. section 1983,
to redress the deprivation, under color of state law, of rights
secured by the Constitution of the United States.
        The Court has jurisdiction under 28 U.S.C. section 1331 and 1343
(A)(3). The Eastern District of New York is an appropriate venue under
28 U.S.C. section 1391 (b)(2), because it is where the events giving
rise to this claim occurred.


1.  PARTIES IN THIS COMPLAINT
    A. Plaintiff: ANTHONY DANIELS  14-A-3224
                  SING SING CORRECTIONAL FACILITY
                  354 HUNTER STREET
                  OSSINING,NEW YORK 10562

    B. Defendant #1:  POLICE OFFICER, MARISOL BONILLA
                                211 UNION AVE. (90th Precinct)
                                BROOKLYN,NEW YORK

       Defendant # 2: POLICE OFFICER, SEAN HUGHES
                                211 UNION AVE.(90th Precinct)
                                BROOKLYN,NEW YORK

        Each Defendant is being Sued individually and in their Official
Capacity. at all times mentioned in this notarized Civil Complaint.
each defendant acted under the color of State Law.


                    FEDERAL COURT JURISDICTION

Defendants, New York State Constitutional Rights under Article 1,

section 1,section 5, section 6, section 9, section 11, section 12

as well as the 4th Amendment, 5th Amendment, 6th Amendment, 8th
Amendment, 9th Amendment and the 14th Amendment of my Constitution
of the United States,Rights.

STATEMENT OF CLAIMS :
1. FALSE ARREST
2. FALSE PROSECUTION, MALICIOUS PROSECUTION

On April 18,2012 at approximately 9:45pm. I Anthony Daniels was
on my way to get something to eat, I witnessed an individual wearing
Dark Jacket and a red hoody sweatshirt drop his bicycle in a abandoning
manner, and run off leaving the bicycle in the process. I walked over
and picked up the bicycle and in the process a pipe falls off the bike,
it appeared that the pipe did not belong to the bike so I threw it away.

Once I continued on my route, P.O.Hughes and SGT.Zabo, tried to
pull me over and I started paddling faster because I did not want to be
arrested for picking up a bicycle that did not belong to me. I did not
have any Idea that a robbery had taken place some blocks away.

In the process of being pursuied, I discarded my brown hoodie and
**Blue** jacket, and the bicycle that did not belong to me. Two and a Half
weeks later some detectives came to my home looking for me. I later made
arrangements to meet with these detectives threw Mr.William Haar, who I
thought would be looking out for my wellfare. which i later found out
was not the case. Mr. William Haar, an Attorney with the Brooklyn Legal
Aid Society was appointed as my Attorney, instructed me to go to the 90th
precinct and he would meet us there. I was never informed what was going
on, during this time the Detectives had escorted me down in the elevator
with the detectives mechanical restraints on me and placed me in a police
van. I was never informed of anything while being escorted by the Detectives

Upon being placed in a room within the 90th precinct before both
detectives, I repeatedly asked why was I placed in hand cuffs/? and was
I under arrest? both detective ignored my questions about this illegal
arrest.

Once Mr.Haar, showed up I was informed by him that I was a suspect in
a spree of robberies, and that the police would be conducting a lineup,
and I could not leave unless I participated in this line-up, which I
did.

(2)

After participating in the line-ups, Mr. Haar then informed me that two people and P.O.Hughes had picked me out of seven individuals Mr. Haar, informed me that the last victim was not sure because it was more of a voice identification than a visual one.

I later found threw my DD #5s reports that it is scientifically impossible for anyone to visually or by voice identify a masked man.

The victims never picked me as being the suspect at the scene of the crime because both victim's perpetrator was wearing a "mask and Hoodie".

Without commencing their own personal investigation into this case, the ADA who is an officer of the Court and as such are fully aware of the Courts procedures when ever they are presented with false allegations against a perpatrator which was the case here. The ADA allowed false police reports to be utilized to obtain an indictment along with false testimony by the police officers to the Grand Jury, then the ADA used all fabricated documents to secure a criminal conviction against me, after the ADA had conspired with Detective Bonilla and P.O.Hughes to give false testimony.

In order for both the officers to testify falsely under oath, the ADA had to prepare them to lie on the stand in order to get a guilty verdict against me. My State and Federal Rights were totally violated, I was denied a fair and partial trial, as well as having individuals who were supposed to up-hold the law, instead, conspired against me to get a conviction on false charges by way of false testimony and false statements on false allegations which have taken place in my case.

Mr. Haar, was also a part of them conspiring against me,by not protecting my Federal and State Constitutional Rights, instead he allowed police officers to conspire and falsely accuse me of a crime I did not commit, taint the photo array as well as the line-up, illegally and wrongfully confine me and falsely arrest me.

<u>INJURIES</u>

I have recieved psychology treatments as well as psychiatric medication, and therapy sessions stemming from my being falsely arrested, falely prosecuted,illegally detained and wrongfully confined, emotionally distressed and I see the Psychologist on a monthly basis for the wrong ful actions stated in the complaint.

(3)

## RELIEF SOUGHT

Wherefore, the Plaintiff requests that upon a jury judgment or settlement, that the Plaintiff be compasated in the amount of 10.000.000 ( TEN MILLION DOLLARS) in compensatory and punitive damages against each defendant, jointly or severally for violating my rights under the United States Constitution, while working under the color of state. The Plaintiff also seeks reimbursement of any and all fee's pertaining to this litigation upon settlement or successfully prevailing on this action.

I declare under penalty of perjury that the foregoing is true and correct upon personal knowledge within this notarized complaint.

ANTHONY DANIELS
14-A-3224
SING SING CORRECTIONAL FAC.
354 HUNTER STREET
OSSINING,NEW YORK 10562

PLAINTIFF/PRO-SE

SWORN TO BEFORE ME THIS
9 DAY OF December, 2014
NOTARY PUBLIC

8/22/15

# EXHIBIT



MAY-02-2012  17:20        90 SQUAD                                    171956566323    P.005
                                                                                Page 4 of 2



| COMPLAINT - FOLLOW UP INFORMATIONAL REPORT - INTERVIEW | | Crime/Condition ROBBERY | Command 090-90TH PRECINCT Date of This Report 04/19/2012 |
|---|---|---|---|

| Date of UF61 04/12/2012 | Date Case Assigned 04/13/2012 | Complaint No. 2012-090-02345 | Case No. 2012 - 861 | Unit Reporting SQUAD | Follow-Up No. 2 |
|---|---|---|---|---|---|

| Complainant's Name WESTFALL, TAYLOR | | | Apt No. |
|---|---|---|---|

| Nickname/Alias/Middle Name | | | |
|---|---|---|---|

| Sex FEMALE | Race WHITE | | Age |
|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

| Perpetrator's Last Name, First M.I. UNK | Wanted/Arrested WANTED |
|---|---|

| Nickname/Alias/Middle Name | | | |
|---|---|---|---|

| Address | | Apt No. | Res. Pct. | NYSID No. |
|---|---|---|---|---|

| Position/Relationship | Sex MALE | Race BLACK | Date of Birth | Age 40 | Height 5FT10IN | Weight 185 |
|---|---|---|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | U.S. Citizen | State/Country of Birth |
|---|---|---|---|---|---|---|

| Description | | | | |
|---|---|---|---|---|

| Accent | Weapon | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) | | Discharged |
|---|---|---|---|---|

| Gang Affiliation | Gang Name | Gang Identifier |
|---|---|---|

| M.O. | Transit M.O. | |
|---|---|---|

| Action Toward Victim | Special Characteristics | New Burglary/Grand Larceny Specific M.O. |
|---|---|---|

| Mask: | Gloves: |
|---|---|

| Clothing Description |
|---|

| Scars, Marks |
|---|

| Impersonation of | If other |
|---|---|

| Frequents Areas in the Confines of the Precinct(s) |
|---|

| Activity Address Location OFFICE | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|

| Cross Street | | Intersection of and | Premise Type |
|---|---|---|---|

| Topic/Subject: (INTERVIEW) INTERVIEWED PO HUGHES |
|---|

**Summary of Investigation:**
1. On April 12, 2012, at approximately 2330 hours, I did interview PO Hughes inside of the 90 Precinct Dectective Squad in regards to this particular Robbery. PO Hughes is assigned to patrol at PSA 3. During the interview PO Hughes stated the following:

PO Hughes stated that on April 12, 2012 at approximately 2152 he was driving in a marked RMP with Sgt Zabo when he heard a 10-85 come over the radio. He stated that he heard the 90 Anti-Crime team put over a pursuit of a male on a bike wearing a black jacket and a red color hooded sweater. PO Hughes stated that they headed in the direction of the pursuit when he hears 90 Crime state that they lost sight of the perp on Lorimer Street and Throop Avenue. He stated that he then continued 90 Crimes pursuit when he observed the perp on the bicycle going N/B on Throop Avenue, the perp then made a left on Walabout Street and was observed by PO Hughes throwing what appeared to be a black/silver firearm over the fence of 399 Walabout Street. He stated that th e perp then fled S/B on Throop Avenue, then made a u-turn to Gerry Street going W/B. PO Hughes stated that he then exited the RMP and pursed the perp on foot losing sight of the perp on Gerry Street and Tompkins Avenue. PO Hughes stated that the perp is a male black, 40-46 years old, pocked skin, wearing a black sweater with a rust color hooded sweater underneath. PO Hughes stated that he did get a good look at the perp and can identify the perp.

2. Case Status: Open

| Reporting Officer: | Rank POF | Name MARISOL BONILLA | | Tax No. | Command 303-90 DET SQUAD |
|---|---|---|---|---|---|

| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 04/19/2012 | Date of Next Review | Name ROBERT MAMYS | Sup. Tax No. |
|---|---|---|---|---|---|

1    they were looking for?

2          A    Yes.  Right.

3          Q    What was that?

4          A    Uh, it was a male black on a bicycle with a brown

5    hoody and a purple bike.

6          Q    And a purple bike?

7          A    Purple bike.

8          Q    Okay.  Now this is, obviously this is nighttime,

9    correct?

10         A    Correct.

11         Q    The only lighting that you would have would be

12   what, the streetlights, store lights, etcetera?

13         A    Correct.

14         Q    Now, you drove onto Throop.  That's when you saw

15   the bike?

16         A    I saw the individual cross the street.  Correct.

17         Q    This was about a half a block away from you at

18   that point?

19         A    Yes.

20         Q    The person on the bike, was he wearing the hoody?

21         A    Yes.

22         Q    Was the hood over his head?

23         A    Hoody was up over his head.  Yes.

24         Q    At that point it would be fair to say you can only

25   see what, the back of his head or the side --

VdV

*GRAND JURY MIN.*

27

```
 1                OFFICER SEAN HUGHES RECALLED

 2

 3     Q.    Officer Hughes prior to observing the defendant

 4     on Throop and Wallabout, what led you to that

 5     location?

 6           A.    I was responding to a call for assistance.

 7     He was being chased by detectives in plain clothes.

 8     They were asking for assistance.   That's why I was

 9     responding to the location.

10     Q.    What was the call about?

11           A.    A call to a robbery.

12           MS. MEHTA:   Ladies and gentlemen the testimony

13     from the officer as to what the call was about it's

14     not being offered for the truth of the matter only to

15     show why the officer was at the location at the time

16     and why the officer then did what he did.

17     Q.    So, officer when you, at that point, when you

18     observed this individual, why did you chase after him?

19           A.    Because he matched the description of the

20     person that was bing described by the other units.

21     Q.    And officer, now, you previously testified that

22     you saw the defendant reach into his waistband and

23     take out an object and throw the object over a fence?

24           A.    That is correct.

25     Q.    Okay.
```

P.O. HUGHES - DIRECT EXAMINATION - DE GENARO

100

1    Q    Were you able to observe if he was holding

2    anything in his hands?

3    A    Yes.  Right before I jumped the curb I saw him go

4    into his waistband and take an object and throw it over the

5    fence (indicating).  And it was, I saw a flash, like it was

6    metallic.  Saw it go over the fence.

7    Q    Where was that?

8    A    That was in the tire shop.  I am not sure of the

9    address.  It was a tire shop that was there.

10   Q    Could you see if the defendant was holding

11   anything else?

12   A    No, ma'am, he wasn't.

13   Q    Now after you saw the defendant, um, throw

14   something over the fence at the tire shop, what did you do?

15   A    That's when I tried to block him in with my car up

16   on the sidewalk.

17   Q    When you did that, what happened?

18   A    He hit the brakes and made a U-turn and went back

19   the same way he came.

20   Q    What did you do?

21   A    Backed the car up in reverse, went back to Throop

22   Avenue, and he had made a right turn onto Throop heading

23   south on Throop, so that's when I turned my car going that

24   way, chasing him the wrong way.

25   Q    Describe -- what is the neighborhood like where

VdV

# EXHIBIT






| COMPLAINT - FOLLOW UP INFORMATIONAL REPORT - INTERVIEW | | Crime/Condition ROBBERY | Command 090-90TH PRECINCT |
|---|---|---|---|
| | | | Date of This Report 04/18/2012 |

| Date of UF61 04/12/2012 | Date Case Assigned 04/13/2012 | Complaint No. 2012-090-02345 | Case No. 2012 - 861 | Unit Reporting SQUAD | Follow-Up No. 5 |
|---|---|---|---|---|---|

**Complainant's Name** WESTFALL, TAYLOR — Address: ███████ No.: ███

Nickname/Alias/Middle Name

| Sex FEMALE | Race WHITE | | |
|---|---|---|---|
| Home Telephone | Business Telephone | Cellphone | Beeper # | E-Mail Address |

**Perpetrator's Last Name, First M.I.** UNK | Wanted/Arrested WANTED

Nickname/Alias/Middle Name

| Address | | | Apt No. | Res. Pct. | NYSID No. |
|---|---|---|---|---|---|

| Position/Relationship | Sex MALE | Race BLACK | Date of Birth | Age 40 | Height 5FT10IN | Weight 185 |
|---|---|---|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | U.S. Citizen | State/Country of Birth |
|---|---|---|---|---|---|---|

Description

| Accent | Weapon | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) | | Discharged |
|---|---|---|---|---|

| Gang Affiliation | Gang Name | Gang Identifier |
|---|---|---|

| M.O. | Transit M.O. | |
|---|---|---|

| Action Toward Victim | Special Characteristics | New Burglary/Grand Larceny Specific M.O. |
|---|---|---|

| Mask: | Gloves: |
|---|---|

Clothing Description

Scars, Marks

| Impersonation of | If other |
|---|---|

Frequents Areas in the Confines of the Precinct(s)

| Activity Address Location OFFICE | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|
| Cross Street | | Intersection of and | | Premise Type |

**Topic/Subject:**
(INTERVIEW) INTERVIEWED PO ARIAS

**Summary of Investigation:**
1. On April 13, 2012, at approximately 0030 hours, I did interview PO Arias inside of the 90 Precinct Detective Squad in regards to this particular Robbery. PO Arias is assigned to the 90 Precinct Anti-Crime Team. During the interview PO Aris stated the following:

PO Arias stated that he was driving around in an unmarked RMP with Sgt. Taveras.
PO Arias stated that on April 12, 2012 at approximately 2152 hours they were on the C/O Manhattan Avenue and Meserole Street when he heard a female screaming. He stated that he then saw a female chasing a male that riding a bicycle S/B on Manhattan Avenue in the street. PO Arias stated that he started to pursue the male. He stated that the male was wearing a brown hooded sweater. PO Arias stated that the male made a right on Boerum Street, a left on Lorimer Street and continued up to Throop Avenue where he then lost sight of the male. He stated that he did not get a good look of the perps face being that it was covered up. Sgt. Taveras transmitted the description and the pursuit on the radio as PO Arias drove the RMP. He stated that he then picked up the C/V and continued canvassing the area with the C/V. PO Arias was then called over to the following locations.

- Wallabout Street and Throop Avenue where the C/V identified her purse that was dropped by the perp.
- Ellery Street and Marcy Avenue where the C/V identified the hoodie that the perp was wearing.
- Rear lot of 398 Wallabout Street where the C/V identified the weapon was found.
- 630 Flushing parking lot where the C/V identified the bicycle that the perp was riding.

All of the above items were left behind by the perp during the pursuit.

2. Case Status: Open

| Reporting Officer: | Rank POF | Name MARISOL BONILLA | Tax No. | Command 303-90 DET SQUAD |
|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing | Date Reviewed 04/19/2012 | Date of Next Review | Name ROBERT MAMYS | Serial No. |

People - Direct - Sgt. Taveras                    73

1       Meserole -- male Black, red sweatshirt, riding down

2       Manhattan from Meserole.

3       Q.     Also a BMX bike?

4       A.     Yes, BMX bike, yes.

5              THE COURT:  Riding down from Manhattan and

6       what?

7              THE WITNESS:  Meserole.

8              THE COURT:  Go ahead.

9       Q.     What happened at that point?

10      A.     We lost sight, so we just canvassed the area.

11      Shortly after, we picked up the complainant.

12      Q.     Who was that -- when you say you picked up the

13      complainant, what was that person's name?

14      A.     I don't remember her name.  I would have to look

15      at my notes.

16             MS. DE GENARO:  Okay.

17             THE COURT:  Go ahead.

18                     (Pause)

19      A.     Taylor Westfall.

20      Q.     Now, after you picked up Taylor Westfall, where

21      did you go?

22      A.     Shortly after that, there was -- during that

23      time, the Housing car picked up the bicycle and they put

24      it over.  We canvassed a little bit more.  Shortly after

25      that, somebody observed clothing and a bicycle by the 79th

# EXHIBIT





# NEW YORK CITY POLICE DEPARTMENT





*Photo Array*



1 _____



2 _____



3 _____



4 _____



5 _____



6 _____

Identification made :  ☑ YES  ☐ NO    Photo selected :  # _____ 5 _____

Date of Identification : _____ 4 | 18 | 12 _____

1              THE COURT: But she didn't make an

2      identification of photos.

3              MR. KIRSCH: No.

4              THE COURT: The only identifications used for

5      the arrest were Hughes, and Westfall. So she's not the

6      subject of the -- she is not part of the Dunaway issue.

7      So I don't see how it's relevant.

8              MR. KIRSCH: All right, you're not allowing me

9      to ask those questions.

10             I take exception.

11             In any event.

12     Q    You also interviewed Miss Westfall, correct?

13     A    Yes, sir.

14     Q    Isn't it a fact Miss Westfall never saw the

15     perpetrator's face, correct?

16     A    No, she did, it's a fact that she did.

17     Q    When?

18     A    When she was fighting with him in the vestibule.

19     Q    Wasn't it a fact his face was covered the entire

20     time?

21             MR. FARKAS: Objection.

22             THE COURT: Well, did she say that to you?

23             THE WITNESS: No, she did not.

24     Q    Did ask you her if it was covered the entire time?

25     A    I'm sorry?

1    A    Yes, sir.

2    Q    That's silver in that photograph?  That's silver

3    in that photograph?

4    A    Silver.  Reflective.  Yeah.  Has a glean to it.

5    Yes.

6    Q    Okay.  Now, afterwards you went down and looked at

7    the photos from the photo manager?

8    A    Yes.

9    Q    You didn't pick out anybody, right?

10    A    No.

11    Q    Then you went to the lineup.

12         Did, when you viewed the lineup did anybody get up,

13    move around, walk forward, say anything, anybody in the

14    lineup?

15    A    Nobody said nothing.

16    Q    They sat there holding numbers?

17    A    They told them stand up.

18    Q    They were all standing up?

19    A    Yes.

20         (Whereupon, there was a pause in the

21    proceedings.)

22         MR. KIRSCH:  Okay.  Could I have this Defense

23    1 for identification.  Defense A I should say.  Sorry.

24         (Whereupon, there was a pause in the

25    proceedings.)

VdV

DET. BONILLA - CROSS EXAMINATION - KIRSCH

190

1       (Whereupon, there was a pause in the

2    proceedings.)

3       Q    Detective, on April 13, 2012 you also interviewed

4    a Police Officer Arias?

5       A    Yes.

6       Q    Okay.  And when you interviewed him he told you

7    that he couldn't get a good look at the person's face,

8    being it was covered up?

9       A    Which DD5 number is that?

10      Q    Mine is number five.

11      A    Okay.

12      Q    I don't know what yours is.

13              (Whereupon, there was a pause in the

14    proceedings.)

15              THE COURT:  I don't understand.  April 13

16    what?

17              MR. KIRSCH:  2012.

18              THE COURT:  Yeah.  Who did she interview?

19              MR. KIRSCH:  Police Officer Arias.

20      Q    He was the driver of Sergeant Taveras who

21    testified earlier; is that correct?

22              (Whereupon, there was a pause in the

23    proceedings.)

24              THE COURT:  What did he say?

25              MR. KIRSCH:  He said he did not get a good

VdV

1    look at the perp's face, being it was covered up.

2    A    Yes.

3                (Whereupon, there was a pause in the

4    proceedings.)

5    Q    When you interviewed Ashley Reardon on April 6,

6    2012 -- this is your follow-up 33.

7                (Whereupon, there was a pause in the

8    proceedings.)

9                MS. DE GENARO:  What was the date?

10               MR. KIRSCH:  This was April 6, 2012.

11               This was, I believe this is Detective Malak's

12   DD5.

13               (Whereupon, there was a pause in the

14   proceedings.)

15   A    I am sorry.  Which number did you say you have?

16   33.

17   Q    33.  Detective Malak's DD5 from April 6.

18               (Whereupon, there was a pause in the

19   proceedings.)

20   A    I can't find that one.

21   Q    Okay.  Let me show you my copy.

22   A    Okay.  Thank you.  Okay.

23   Q    Okay.  You are the case detective on this case,

24   correct?

25   A    Yes, I am.

                          VdV

1       A     Yes.

2       Q     I'm sorry just -- withdrawn.

3             Did, was Officer Hughes able to give a description

4    of the individual that he was following?

5       A     Yes.

6       Q     What was that description?

7       A     Male black, 40 to 45 years old. Pocked skin, wearing

8    a black sweater with a rust color hoodie, sweater underneath.

9       Q     Were you able to -- did you speak with anyone else

10   in regards to this incident?

11      A     Yes, I did.

12      Q     Okay, and who was that?

13      A     P.O. Arias.

14      Q     And can you describe the conversation with Officer

15   Arias?

16      A     P.O. Arias is one of the anticrime officers in the

17   90th Precinct, he stated he was driving with Sergeant

18   Tavares. They heard a female screaming for help, at which

19   point they saw a female chasing a male on a bicycle. He

20   stated that as he approached the female was yelling and

21   pointing at the male stating, "He just robbed me," stated

22   they pursued the individual or the bike and they lost sight

23   of him on Lorimer and Throop. He stated he never got to see

24   the Defendant's face, but it was a male black wearing a red

25   hoodie sweater. And they believe a black jacket over it.

1    A    I was at the 90th Precinct Detective Squad getting

2  ready to view lineups.

3    Q    To conduct lineups?

4    A    To conduct lineups, sorry.

5    Q    Do you recall how many people were there to view

6  this lineup?

7    A    Yes, three.

8    Q    Okay, now who were they?

9    A    Ashley Reardon, Taylor Westfall and Officer Hughes.

10   Q    Can you tell us who Ashley Reardon is?

11   A    Ashley Reardon was a victim of a robbery that

12 occurred on April 6th of 2012.

13   Q    Now, did you have an opportunity to speak to Miss

14 Reardon?

15   A    Yes, I did.

16   Q    Can you tell us what if anything she told you?

17   A    Miss Reardon stated on April 6, of 2012, she was

18 entering the building that she lives in which is located at

19 117 South Third Street.

20       She stated once she entered the building she noticed

21 a male black enter the building behind her. She stated that

22 she pressed the button for the elevator. Once the elevator

23 came to the lobby of the building she looked at this

24 individual and said, "You don't belong in this building, you

25 should leave." She says that the male then tells her to enter

1     the elevator, not to worry, he's not going to hurt her, don't

2     scream, don't cry.

3              She says at this point, the male stated for her to

4     give him all of her money. She then told him she didn't have

5     any money, all she had was a cell phone. He then searched her

6     to make sure she didn't have any property on her and took her

7     cell phone from her. She says he had some sort of weapon, she

8     wasn't sure if it was a firearm --

9              THE WITNESS: If I can look at my notes so I can

10        get the correct description?

11             THE COURT: Tell us what you're referring to

12        again?

13             (Witness checking notes.)

14             THE WITNESS: Sure.

15             (Witness checking notes.)

16             THE WITNESS: DD-5 number 33.

17             She stated he was holding a shiny chrome

18        colored object that she described as a long cylinder

19        shape. She was unsure if it was a firearm.

20             She stated at that point the Defendant left in

21        an unknown direction.

22    Q     Was there a description that was given as well?

23    A     Yeah, the description she gave was a male

24    approximately six foot tall, light skinned black or

25    dark-skinned Hispanic wearing a camouflage color hooded

1   Q   Did you call anybody else?

2   A   Yes, I did.

3   Q   Who else did you call?

4   A   Don't recall her name.

5   Q   Was it Blanca Lao?

6   A   No, it was not.

7   Q   Somebody else came to view the lineup?

8   A   Yes.

9           MR. KIRSCH:  I have nothing further.

10          (Whereupon, there was a pause in the

11  proceedings.)

12          THE COURT:  All right.  You may step down.

13          THE WITNESS:  Thank you.

14          THE COURT:  Do you have any other witnesses

15  today?

16          MS. DE GENARO:  Not this morning, Judge, but

17  if we could just approach.

18          THE COURT:  Come on up.

19          (Whereupon, the witness was excused from the

20  stand.)

21          (Whereupon, there was a discussion held at

22  the bench off the record.)

23          THE COURT:  Wednesday at 10 o'clock.

24          MR. KIRSCH:  Wednesday 10 o'clock, Judge?

25          THE CLERK:  Adjourned to Wednesday on this

VdV

DET. BONILLA - CROSS EXAMINATION - KIRSCH

184

1    being the case detective here, that Taylor Westfall never

2    saw Mr. Daniels's -- the victim -- the perpetrator's face,

3    correct?

4         A     That's not what I was told.  No.

5         Q     Well who told you that there was something

6    different, that she saw his face?

7         A     She said she saw his face.

8         Q     When did she say she saw his face?

9         A     During the interview.

10        Q     She said she saw his face?

11        A     She said she saw his face and can identify him.

12        Q     And she didn't testify he was wearing a mask?

13        A     Not to me.  I don't know what she testified in the

14   other room.

15              MS. DE GENARO:  Objection.

16        Q     I will rephrase this.

17              She didn't tell you?

18              THE COURT:  Sustained.

19        Q     She didn't tell you that he was wearing a mask

20   that covered from his nose down to his chin?

21        A     No, she did not.

22        Q     Now, do you know somebody named Blanca Lao?

23   L-A-O.

24        A     Yes, I do.

25        Q     Okay.  And on April 18 she viewed a photo array,

VdV

1          proceedings.)

2          A     They were of different heights.

3          Q     Ranging in height from 5' 7" to 5' 11", correct?

4          A     Correct.

5          Q     All right.  And the reason you had them all

6     sitting, so they would all be approximately the same

7     height.  That it wouldn't be a, somebody standing out

8     because they were taller or not, correct?

9          A     Every lineup we do they're seated.

10         Q     Except this one, correct?

11         A     They're seated.

12         Q     When you took the picture, the one picture, all

13    right, they were seated?

14         A     They were seated.  Yes.

15         Q     When these witnesses viewed the lineup they

16    weren't seated anymore, were they?

17         A     Yes, they were.

18         Q     They weren't standing for Ashley Reardon?

19         A     Not that I recall.

20         Q     They weren't standing for Officer Hughes?

21         A     Not that I recall.

22         Q     And for Taylor Westfall they stood up?  Did they

23    move forward?

24         A     Yes, they did.

25         Q     And the reason for that was, as you knew from your

VdV

1    giving these answers?

2                    MR. KIRSCH:  This is on page 32.

3    A    How --

4                    THE COURT:  What date was this?

5                    MR. KIRSCH:  December 4, 2013.

6                    Line 18.

7                    "QUESTION:  Okay.  Now when these witnesses

8    were viewing the lineup, were the people in the lineup,

9    did they remain in the same position as depicted in the

10   photograph?

11                   "ANSWER:  Yes.

12   A    Yes.

13   Q    Do you remember being asked that question and

14   giving that answer?

15   A    Now that you are reading it, yeah.

16   Q        "QUESTION:  They never moved?

17            "ANSWER:  Never moved.

18   A    Okay.

19   Q    Did you remember being asked that question and

20   giving that answer?

21   A    Now that you are reading it.

22   Q        "QUESTION:  They never stood up?  They never

23            walked around?  They just sat there, correct?

24            "ANSWER:  They just sat there.  Correct.

25   A    Which victim are we speaking about?

                              VdV

1    take?

2         A    I took one.

3         Q    Would it be fair to say then that the photos

4    attached to each one of those exhibits as 18, 19 and 20

5    were all duplicates --

6         A    Yes.

7         Q    -- of the one photo you took?

8         A    Yes.

9         Q    Now, People's 3, witnesses viewed the lineup,

10   correct?

11        A    Yes.

12        Q    Miss Reardon, Miss Westfall and Officer Hughes,

13   correct?

14        A    Correct.

15        Q    When they viewed the lineup did it look like the

16   photographs?

17        A    Yes.

18        Q    Nobody moved?  They all sat there with the

19   numbers?

20        A    In the beginning they all sat there, and then they

21   moved for actually Ashley -- no, Taylor Westfall's view.

22        Q    Just for Taylor Westfall?

23        A    Just for Taylor Westfall.

24        Q    Not for Ashley Reardon?

25        A    Not that I recall.

VdV

1    packaging?

2            I mean you described the plastic, but was that put

3    into evidence, anything?  How was it packaged?

4        A    Yes.  It's packaged inside of a plastic envelope

5    and it's sealed.  Then that envelope goes inside a security

6    bag and it gets sealed and signed off by the bosses.

7        Q    And do you sign this as well?

8        A    I sign that as well.

9        Q    Where does your signature appear on this

10   packaging?

11       A    It I believe it appears on the evidence tape.

12           (Whereupon, there was a pause in the

13   proceedings.)

14           MS. DE GENARO:  I have no further questions.

15           THE COURT:  Cross.

16   CROSS EXAMINATION

17   BY MR. KIRSCH:

18       Q    Good afternoon, detective.

19       A    Good afternoon.

20       Q    Now, detective, you conducted lineups on August --

21   sorry, on April 26 of 2012 with regards to this case,

22   correct?

23       A    Yes.

24       Q    Now, the photos of the lineup were placed into

25   evidence, how many photos of the lineup did you actually

VdV

DETECTIVE BONILLA - FARKAS/DIRECT                    14

1    A    The computer works off of that photo.

2    Q    Okay, what if anything did you do with that photo?

3    A    I then --

4    Q    That photo array?

5    A    I then showed the photo array to P.O. Hughes.

6    Q    Just to take you back, how many picture are in that

7  photo array?

8    A    Including the Defendant's, six.

9    Q    Now, did you alter the pictures in any way?

10   A    No, I did not.

11   Q    And --

12          THE COURT: When did you show it to Hughes?

13          THE WITNESS: Do you mind if I take a look at

14   the date?

15          THE COURT: Tell us what you're referring to.

16          THE WITNESS: My DD-5.

17          (Witness checking notes.)

18   A    That's DD-5 number eight -- sorry DD-5 number seven,

19  that was on April 18.

20   Q    And can you tell us what Officer Hughes was told to

21  do prior to looking at that photo array?

22   A    I read him the viewing instructions, he was told

23  there would be six individuals in the six photos of six

24  different individuals. He was to take his time, look at the

25  photos and tell me if he recognized anyone.

1    Q    Did he, in fact, recognize anyone in that photo

2    array?

3    A    Yes, he did.

4    Q    Do you recall which picture he indicated?

5    A    Number five.

6    Q    Did he memorialize it in any way?

7    A    Yes.

8    Q    Okay, how?

9    A    He circled the picture and put his signature.

10    MR. FARKAS: I'm going to now ask that the

11    witness be shown People's One for identification.

12    (Handing exhibit to witness.)

13    Q    Do you recognize that?

14    A    Yes.

15    Q    How do you recognize it?

16    A    This is was the photo array that I had shown to

17    Officer Hughes.

18    Q    Does it fairly and accurately represent that photo

19    array that you showed to him on April 18th of 2012?

20    A    Yes.

21    MR. FARKAS: I would now ask that People's One

22    for identification be moved into evidence as People's

23    One.

24    THE COURT: All right, we'll deem it in evidence

25    for the purposes of the hearing.

45

1          THE COURT: Tell us what you're referring.

2          THE WITNESS: ID-5, number four.

3          The time is not on here.

4          Let me take a look at the 61, if that's okay.

5          THE COURT: All right.

6          The time of the incident was 21:45, which is

7     9:45 p.m..

8     Q    Now when you set up this lineup, withdrawn.

9          The photo array, did you just show that to Officer

10    Hughes or did you show it to Miss Westfall or Miss Reardon

11    also?

12    A    I only showed it to Officer Hughes.

13    Q    Now Officer Hughes' description was male black in

14    his 40's with pocked skin, is that correct?

15    A    That is correct.

16    Q    About five, 10, 180 pounds, is that right?

17    A    In my DD-5 it just gives male black, pocked skin,

18    and age, it doesn't give a height or weight.

19    Q    It did give an age though, is that correct?

20    A    Yes, approximately 40 to 45 years old.

21    Q    Okay. Now, when you conducted the lineups, how did

22    the witnesses arrive at the nine, 0 Precinct, do you know?

23    A    They arrived on their own.

24    Q    They all came separately?

25    A    Yes.



| COMPLAINT - FOLLOW UP INFORMATIONAL REPORT - Other Attachments | | | | Crime/Condition ROBBERY | Command 090-90TH PRECINCT Date of This Report 04/19/2012 |
|---|---|---|---|---|---|
| Date of UF61 04/12/2012 | Date Case Assigned 04/13/2012 | Complaint No. 2012-090-02345 | Case No. 2012 - 861 | Unit Reporting SQUAD | Follow-Up No. 6 |

| Complainant's Name WESTFALL, TAYLOR | | Address | | |
|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | |
| Sex FEMALE | Race WHITE | | | |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |

| Perpetrator's Last Name, First M.I. DANIELS, ANTHONY | | | | Wanted/Arrested WANTED | | |
|---|---|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | | | |
| Address 126 NOSTRAND AVENUE BROOKLYN NY 11216 | | | Apt No. 4C | Res. Pct. 079 | NYSID No. 05079455P | |
| Position/Relationship STRANGER | Sex MALE | Race BLACK | Date of Birth 04/23/1967 | Age 44 | Height 5FT 10IN | Weight 205 |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | U.S. Citizen | State/Country of Birth |

**Description**
Eye Color:BROWN Hair Color:UNKNWN Hair Length:BALD Hairstyle:BALD Complexion:UNKNOWN Skin Tone:MEDIUM

| Accent No | Weapon USED/DISPLAYED | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) Gun:ALLEGED GUN | Discharged No |
|---|---|---|---|
| Gang Affiliation No | | Gang Name | Gang Identifier |
| M.O. | | Transit M.O. | |
| Action Toward Victim | | Special Characteristics | New Burglary/Grand Larceny Specific M.O. |
| Mask: | | Gloves: | |

**Clothing Description**
Head Gear:UNK Foot Gear:UNK Outer Wear:SWEAT SHIRT OR JOGGING JACKET Color:BROWN Other Clothing/Accessories:JEANS Color:BLACK

**Scars, Marks**
Distinguishing Body Marks (1):UNKNOWN Distinguishing Body Marks (2):UNKNOWN

| Impersonation of UNKNOWN | If other |
|---|---|

Frequents Areas in the Confines of the Precinct(s)

| Activity Address Location OFFICE | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|
| Cross Street | | Intersection of and | | Premise Type | |

**Topic/Subject:**
(Other Attachments) PHOTO ARRAY

**Summary of Investigation:**
1. On April 18, 2012, at approximately 1918 hours, Victim Blanca Lao was present at the 90 Pct Detective Squad in regards to this particular investigation. At this time I did read the Photo Array Pre-Viewing Instructions to PO Hughes. PO Hughes then viewed the Photo Array, the suspect of the Photo Array is Anthony Daniels Nysid #05079455P, who was in position #5 in the Photo Array. The Photo Array consisted of six individuals of the same or similar ethic background, and similar physical characteristics. The Victim picked #5 in the Photo Array, which was then initialed by PO Hughes next to the chosen photo. After viewing the Photo Array PO HUghes then signed the Photo Array Viewing Report. Attached are copies of all of the Photo Array paperwork.

2. Case Status: Open

| Reporting Officer: | Rank POF | Name MARISOL BONILLA | Tax No. | Command 303-90 DET SQUAD |
|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 04/27/2012 | Date of Next Review | Name ROBERT MAMYS | Supv. Tax No. |

DET. BONILLA - DIRECT EXAMINATION - DE GENARO

156

1      Q      Before that you were in the academy?

2      A      Yes.

3      Q      Turning your attention to April 12 of 2012, that

4   day did you become involved in the investigation of a

5   robbery of an individual named Taylor Westfall?

6      A      Yes, I did.

7      Q      How is it that you became involved in that

8   investigation?

9      A      I was the detective on duty that day and the case

10  was assigned to me.

11     Q      How did you first become aware that Taylor

12  Westfall had been, or that there was an alleged robbery of

13  Taylor Westfall?

14     A      I heard it over the radio.

15     Q      What did you hear specifically?

16     A      I heard a foot pursuit, actually a car chase come

17  over the radio, and they stated that someone was robbed and

18  they were in pursuit of the defendant.

19     Q      At that time did you know or do you know a

20  description that was given over the radio?  Do you remember

21  what that was?

22     A      It was a male black on a bicycle wearing either

23  brown or red hooded sweater with a black jacket.

24     Q      Where were you when you heard that radio

25  transmission?

VdV

1          THE COURT:  Hold on.  Male black, 40 to 45.

2          Go ahead.

3          MR. KIRSCH:  Years old.

4     Q    Pocked skin, correct?

5     A    Correct.

6     Q    Wearing a black sweater with a rust colored

7  hood -- excuse me.  With a rust color hooded sweater

8  underneath; is that correct?

9     A    Correct.

10    Q    When you arrested Mr. Daniels did he have pocked

11  skin?

12    A    No.

13    Q    Okay.

14          (Whereupon, there was a pause in the

15  proceedings.)

16          MR. KIRSCH:  I have no further --

17          THE COURT:  Wait a minute.

18          The interview of Hughes, that was the

19  description was given by the victim; is that correct?

20          THE WITNESS:  That interview of Hughes was

21  the description given by Officer Hughes.

22          THE COURT:  Of the defendant?

23          THE WITNESS:  Yes.

24          THE COURT:  Oh, okay.

25          MR. KIRSCH:  One second, Your Honor.

VdV

1      Q     Okay, did there come a time you spoke with anyone

2    else?

3      A     Yes.

4      Q     Who was that, if you recall?

5      A     I received a phone call from Sergeant McCarthy of

6    the 79th Precinct.

7      Q     Can you tell us the substance of that conversation?

8      A     Sorry -- he stated that he was um, looking in our

9    cases and they had a case similar to the one that we were

10   investigating a couple of years ago with an individual

11   fitting the same description, and the same type of robberies.

12   He gave me his NYSID number and told me I should look into

13   this individual, and it's possible that he can be my suspect.

14     Q     The NYSID number?

15     A     NYSID number is the New York State identification

16   number.

17     Q     Okay, what if anything did you do with that number?

18     A     I ran the number through the system. I looked at the

19   individual um, in fact the individual fit the description of

20   my victim. So, I took the photo of that person and I put it

21   into a photo array.

22     Q     Now when you say that individual, the NYSID number

23   fit the description of your victim, can you clarify what you

24   mean by that?

25     A     The description that the victim had given of a male

# EXHIBIT





| COMPLAINT - FOLLOW UP INFORMATIONAL REPORT - INTERVIEW | | Crime/Condition ROBBERY | Command 090-90TH PRECINCT Date of This Report 04/13/2012 |
|---|---|---|---|

| Date of UF61 04/12/2012 | Date Case Assigned 04/13/2012 | Complaint No. 2012-090-02345 | Case No. 2012 - 861 | Unit Reporting SQUAD | Follow-Up No. 4 |
|---|---|---|---|---|---|

**Complainant's Name**
WESTFALL, TAYLOR

**Nickname/Alias/Middle Name**

| Sex FEMALE | Race WHITE | | | | |
|---|---|---|---|---|---|
| Home Telephone | Business Telephone | | | Beeper # | E-Mail Address |

**Person Interviewed Last Name, First M.I.**
WESTFALL, TAYLOR

**Nickname/Alias/Middle Name**

| Position/Relationship | Sex FEMALE | Race WHITE | | Date of Birth | |
|---|---|---|---|---|---|
| Home Telephone | Business Telephone | | | Beeper # | E-Mail Address |

**Perpetrator's Last Name, First M.I.**
UNK

**Wanted/Arrested**
WANTED

**Nickname/Alias/Middle Name**

| Address | | | | Apt No. | | Res. Pct. | NYSID No. |
|---|---|---|---|---|---|---|---|
| Position/Relationship | Sex MALE | Race BLACK | Date of Birth | Age 40 | | Height 5FT10IN | Weight 185 |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | | U.S. Citizen | State/Country of Birth |

| Description | | | | |
|---|---|---|---|---|
| Accent | Weapon | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) | | Discharged |
| Gang Affiliation | | Gang Name | Gang Identifier | |
| M.O. | | Transit M.O. | | |
| Action Toward Victim | | Special Characteristics | New Burglary/Grand Larceny Specific M.O. | |
| Mask: | | Gloves: | | |
| Clothing Description | | | | |
| Scars, Marks | | | | |
| Impersonation of | | If other | | |
| Frequents Areas in the Confines of the Precinct(s) | | | | |

| Activity Address Location OFFICE | | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|---|
| Cross Street | | | Intersection of and | | | Premise Type |

**Topic/Subject:**
(INTERVIEW) INTERVIEWED VICTIM AT √ - AND INCIDENT TOOK PLACE AT 9:45 pm

**Summary of Investigation:**
1. On April 13, 2012, at approximately 2345 hours, I interviewed victim, Taylor Westfall, at the 90 Detective Squad. Taylor was the victim of a robbery that just occurred at 155 Manhattan Avenue.

2. Taylor said she was walking from the subway on Montrose and Bushwick Avenue going towards her apartment on Manhattan Avenue. She did not notice anyone following her while she was walking. When she got to her apartment, she used her keys to open the building door to the vestibule. She entered and went to open the second door to the lobby when the building door started to open. She grabbed the door to open it when a black male appeared from outside and grabbed for her pocketbook. She began struggling with the male. The male told her to, "shoosh." She continued to fight and scream and then the male pulled out a firearm from his right pocket. The male hit her on the head with the weapon 5-6 times. The victim fell to the ground and the perpetrator then kicked her. The victim let go of the purse and the perpetrator ran out of the building.

3. The victim ran out of the building and began chasing the perpetrator. The perpetrator was on a dark bicycle. He fled south on Manhattan Avenue. The victim was screaming and yelling while chasing him. Near Boerum Street and Lorimer, the victim was able to wave down a patrol car. The cops began chasing the perpetrator. They lost sight of him in the rear of 630 Flushing Avenue.

4. The police were able to retrieve the victim's pocketbook on Wallabout and Throop Avenue.

5. The victim suffered lacerations on both sides of the head and a bruise to the shoulder. She was treated by EMS at the 90 Squad. She did not go to the hospital.

6. She describes the perpetrator as a male black, in his 40s, about 5'10, 185 lbs. He was wearing a brown hoody and black sweater over it.

| Reporting Officer: | Rank DT3 | Name CHRISTOPHE SCARRY | | Tax Reg. No. | Command 303-90 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing | Date Reviewed | Date of Next Review | Name | Supv. Tax No. |

*GRAND JURY MIN.*                              17

```
 1              TAYLOR WESTFALL RECALLED

 2

 3    Q.   Ms. Westfall, you've previously testified that

 4    you identified -- that you recognized a person during

 5    the lineup and you identified that person as Anthony

 6    Daniels.

 7         A.   Yes.

 8    Q.   Now, how were you able to identify the defendant

 9    in the lineup because as you previously testified he

10    was wearing a mask.

11         A.   Yes, based on his height, his build, the

12    force that he hit me with, his skin color and his

13    eyes.

14    Q.   Okay.

15         And Ms. Westfall, when the defendant was hitting

16    you with -- hitting you, what did it feel like you

17    were being hit with?

18         A.   Metal.

19    Q.   Okay.

20         Thank you Ms. Westfall, no further questions.

21         A.   Okay.

22              Thank you.

23

24                        (WITNESSED EXCUSED)

25
```

1    he came into the vestibule?

2         A.   He reached for my purse.

3    Q.   And was the defendant able to -- did the

4    defendant grab your purse or --

5         A.   He reached for my purse.  Once I saw him

6    enter the vestibule I started screaming.  He reached

7    for my purse, I didn't let it go.  He said, "shh"

8    because I was screaming and I had not let go of the

9    bag.

10   Q.   You were still holding onto the bag, was the

11   defendant still trying to get the bag?

12        A.   Yes.

13   Q.   Okay.

14        Did he have his hand on the bag?

15        A.   Yes.

16   Q.   Was there any a struggle for your bag?

17        A.   Yes.  I continued to scream.  He said,

18   "Shh".  I didn't let go of the bag, he pulled out a

19   weapon.

20   Q.   Can you describe what that item looked like?

21        A.   It was a black handgun with a long silver

22   silencer on the end.

23   Q.   About this long your indicating?

24        A.   The length of this.

25   Q.   About six to eight inches in length is what

People - Cross - Westfall                                    62

1          THE COURT:  You have to say yes or no.

2     A.    Yes.

3     Q.    You couldn't tell who it was just by having them

4   sit over there when you first saw them?

5     A.    No.

6     Q.    As a matter of fact, when you identified the

7   defendant here today, it's based on how he looked at the

8   lineup; is that right?

9     A.    Yes.

10          MS. DE GENARO:  Objection.

11          THE COURT:  Read back the question and

12   answer.

13    (Whereupon, the question and answer is read back.)

14          THE COURT:  I will allow it.

15    Q.    Now, you testified, this object was a silver

16   tube of some kind; is that correct?

17    A.    A metal tube, yes.

18    Q.    Do you know what color it was -- was it

19   chrome-colored, silver-colored, black-colored?

20    A.    I don't remember.

21    Q.    Now, do you remember testifying in the Grand

22   Jury on this case, I believe it was in May of 2012?

23    A.    It was last year.  I remember it, but I don't

24   remember everything.

25    Q.    Do you remember being asked this question and

# EXHIBIT



| COMPLAINT - FOLLOW-UP INFORMATIONAL REPORT - INTERVIEW | | Crime/Condition ROBBERY | Command 090-90TH PRECINCT Date of This Report 04/06/2012 |
|---|---|---|---|

| Date of UF61 04/06/2012 | Date Case Assigned 04/06/2012 | Complaint No. 2012-090-02186 | Case No. 2012 - 799 | Unit Reporting SQUAD | Follow-Up No. 33 |
|---|---|---|---|---|---|

| Complainant's Name REARDON, ASHLEY | | Address | | | No. |
|---|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | | |
| Sex FEMALE | Race WHITE | | | Age | |
| Home Telephone | Business Telephone | Cell Ph. | Beeper # | E-Mail Address | |

| Person Interviewed Last Name, First M.I. REARDON, ASHLEY | | Address | | Apt No. |
|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | |
| Position/Relationship | Sex FEMALE | Race WHITE | | Age |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |

| Activity Address Location OFFICE | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|
| Cross Street | | Intersection of and | | Premise Type | |

**Topic/Subject:**
(INTERVIEW) INTERVIEWED C/V ASHLEY REARDON

**Summary of Investigation:**

1. On April 6, 2012, at approximately 1010 hours, C/V Ashley Reardon was present at the 90 Pct. Det. Squad office and interviewed in regards to this case. C/V stated she entered the lobby of her building ( ) and was followed in by a male described as being approx. 6 foot tall, light skin black or dark skin Hispanic wearing a camouflage colored hooded sweatshirt and a black colored vest, he also was wearing tan colored cargo pants. C/V stated as the male entered the building the male w as saying something to her, but the C/V stated that his voice was muffled and she did not understand what he was saying. C/V stated that she pressed the button for the elevator, then told the male that he does not belong in the building and he should leave. C/V then stated that the elevator's door opened up, and the perp then told her to get into the elevator, as he covered his face with a black colored mask. C/V then stated that the perp told her that he's not going to hurt her, and not to cry or scream. Perp then stated Give me your money. C/V then replied I don't have any money, I just have my phone. C/V then stated that perp patted her down and removed her cell phone from her left coat pocket. C/V then stated that the perp exited the elevator , then fled the building in an unknown direction. C/V stated that the perp was holding a shiny chrome colored object that she described as being a long cylinder shape. She then stated that she is unsure if it was a firearm, and stated that the object did not have a handle of a gun.

2. C/V stated after the Robbery occurred she went online from her home computer and wiped the data from her cellphone (Apple I PHONE) , and stated that the cell phone can no longer be traced. C/V also provided me with the cell phone IMEI # 

3. Case Active

| Reporting Officer: | Rank DT3 | Name ERIK MALAK | | Tax Reg. No. | Command 303-90 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing | Date Reviewed 04/12/2012 | Date of Next Review | Name RAYMOND MARTINEZ | Supv. Tax No. |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANTHONY DANIELS,
                    PLAINTIFF,                    14-CV-3017 (KAM)(LB)

                                                  AFFIRMATION OF SERVICE

        -against-

MARISOL BONILLA and SEAN HUGHES,
                    N.Y.P.D.
                    DEFENDANTS,

        I, ANTHONY DANIELS, DECLARE UNDER PENALTY OF PERJURY THAT
I HAVE SERVED A COPY OF THE ATTACHED, NOTICE OF REQUEST FOR LEAVE TO
FILE AN AMENDED COMPLAINT, AMENDED COMPLAINT AND EXHIBITS UPON ATTORNEY
FOR DEFENDANTS, ZACHARY W.CARTER, CORPORATION COUNSEL OF THE CITY OF
NEW YORK. 100 CHURCH STREET, NEW YORK, NEW YORK 10007.
    BY PLACING SAID COPIES IN A POSTAGE PAID ENVELOPE IN THE MAILBOX AT
SING SING CORRECTIONAL FACILITY, 354 HUNTER STREET,NEW YORK 10562.

DATED: 12/9    2014

IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ DEC 1 5 2014 ★
4:42 PM · RV
BROOKLYN OFFICE

*Anthony Daniels*
ANTHONY DANIELS
14-A-3224
PLAINTIFF/PRO-SE
SING SING CORR.FACILIY
354 HUNTER STREET
OSSINING,NEW YORK 10562

SWORN TO BEFORE ME THIS

9 DAY OF December,2014

*Patricia Lewis*
PUBLIC NOTARY

PATRICIA LEWIS
NOTARY PUBLIC STATE OF NEW YORK
DUTCHESS COUNTY LIC. #01LE6133028
COMM. EXP. 8/22/15





Anthony W Daniels #14A3224
Sing Sing Corr. Facility
354 Hunter St.
Ossining, N.Y. 10562-5442

Clerk of U.S. District Court
Eastern District Of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201

LEGAL MAIL